# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| ROBERT S. MILLER | : BANKRUPTCY NO. 05-16936 |
| | : |
| DEBTOR | : |

———————————————————————

# OPINION

By:   STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

The United States Trustee has filed a motion to dismiss this case under § 707(b).

The Debtor opposes the motion.  A hearing on this matter was held on November 15,

2005 after which the matter was taken under advisement.  For the reasons set forth

below the Motion will be granted.

*Applicable Law*

Former Bankruptcy Code § 707 provides:

> [T]he court may …dismiss a case filed by an individual
> debtor under this chapter whose debts are primarily
> consumer debts if it finds that the granting of relief would be
> a substantial abuse of the provisions of this chapter. There
> shall be a presumption in favor of granting the relief
> requested by the debtor. …

11 U.S.C. § 707(b).[1]  Two elements must be established for this Court to determine that

the proceeding must be dismissed: that the Debtor owes "primarily consumer debts"

———————————————————————

[1]Because this case was filed prior to the effective date of the Bankruptcy Abuse Prevention
and Consumer Protection Act, the new "means test" which establishes a presumption of abuse
does not apply here.

and that this filing constitutes a "substantial abuse."  As to both elements, the Trustee

bears the burden of proof.  *In re Browne*, 253 B.R. 854, 855-56 (Bankr.N.D.Ohio 2000)

*Does this Debtor Owe
Primarily Consumer Debts?*

The Bankruptcy Code defines consumer debt as debt "incurred by an individual,

primarily for a personal, family, or household purpose."  11 U.S.C. § 101(8).  In applying

this definition, many courts have looked to whether the debt was incurred with a profit

motive.  6 *Collier on Bankruptcy* ¶ 707.04[3][a].  And in determining how much of the

debt must be consumer- as opposed to business-related, the courts have interpreted

the term "primarily" with some variation.  An early case determined the question on the

basis of "all of the facts and circumstances presented." *In re Bryant*, 47 B.R. 21, 26

(W.D.N.C. 1984) (finding that the debtor had primarily consumer debts when both the

number and amount of consumer debts exceeded the business debts).  Other courts

have held that a bare majority of consumer debts will suffice.  *See In re Stewart*, 175

F.3d 796, 808 (10th Cir. 1999) ("primarily means over 50% of debt); *In re Booth*, 858

F.2d 1051, 1055 (5th Cir. 1988) (stating that " 'primarily' suggests an overall ratio of

consumer to non-consumer debts of over fifty percent ... consumer debts should be

evaluated not only by amount, but by their relative number"); *In re Kelly*, 841 F.2d 908,

913 (9th Cir. 1988) (holding that when "more than half ... of the dollar amount owed is

consumer debt, the statutory threshold is passed;" 88% of the debt was consumer

debt); *In re Bell*, 65 B.R. 575, 577 (Bankr. E.D. Mich. 1986) (according more weight to

the amount of debt involved than to the number of consumer debts in relation to other

debts).  The leading bankruptcy commentator explains the standard more generally:

"The term primarily would seem to imply that the debts should reflect a strong consumer

orientation." 6 *Collier on Bankruptcy* ¶ 707.04[3][d]. What does the record show in that

regard?

The motion alleges that "Debtors [sic] in the present case acknowledge that the

debts listed on their Schedules were incurred for the purpose of purchasing consumer

products, and not for the purpose of producing income." Motion ¶ 8. In his response,

the Debtor admits the substance of this allegation and argues, instead, that such debts

are not collectable because they are beyond the limitations period. *See* Response, ¶ 8.

Yet, at the hearing, the Debtor would recant his admission that his debts were

consumer debts. Transcript (T) -4. The record, however, contains no amendment of

the admission. Generally, factual assertions admitted by a party in an answer or

response are considered judicial admissions which are conclusively binding upon the

party who made them. *In re C.F. Foods, LP*, 265 B.R. 71, 87 (Bankr.E.D.Pa.2001). So

as a technical legal matter, this Debtor is estopped from arguing that his debts are not

consumer debts. But even if he were not precluded from raising the issue, the Court

finds the Debtor's testimony on this point to have little credibility. When pressed by the

Trustee as to how he had arrived at the percentages for those debts which are part

business and part consumer, the Debtor admitted that he was guessing. T-38. The

debts were simply too old for him to recollect the nature of each. *See* T-13 (contending

that his debts are ten years old). Documentation might have helped but all that the

Debtor claims to have been able to recover is two monthly account statements for his

American Express Card. The Court therefore finds that the Trustee has met his burden

in proving that the Debtor's debts are primarily consumer claims for purposes of this

3

motion.

*Substantial Abuse*

Next, the Trustee maintains that the granting of relief to this Debtor would constitute "substantial abuse."  Motion, ¶ 9.  While the Bankruptcy Code does not define the term, the legislative history indicates that the Congressional intent behind the passage of § 707(b) was to restrict the use of chapter 7 by petitioners not in need of relief or acting in bad faith.  S. Rep. No. 65, 98th Cong., 1st Sess. 54 (1983).   Section 707(b) focuses on the purpose of Chapter 7 relief under the Bankruptcy Code, primarily the issue of whether the petitioner is the honest and needy consumer debtor the Code was intended to protect.  *In re Motilla*, 306 B.R. 782, 788 (Bankr.M.D.Pa.2004).  Whether such abuse exists in a case is largely left to the court's discretion." *In re Miller*, 302 B.R. 495, 498 (Bankr.M.D.Pa.2003), *citing In re Bacco*, 160 B.R. 283, 288 (Bankr.W.D.Pa.1993). "Section 707(b) has always been intended, at least in part, to balance the interests of a debtor who cannot pay his debts as they come due against a creditor's interest in obtaining repayment of at least a portion of the debts if such repayment would not be a burden." Ann Morales Olazabal, *Consumer Bankruptcy Reform and 11 U.S.C. § 707(b): A Case-based Analysis*, 12 B.U. Pub. Int. L.J. 317, 326-27 (2003).  While the Third Circuit has not had occasion to rule on the question of what constitutes substantial abuse for purposes of § 707(b), other circuits have.  A recent bankruptcy case from this circuit thoroughly surveyed the various methodologies employed:

The first court of appeals to provide a framework for

4

analyzing substantial abuse, the Ninth Circuit Court of Appeals, has held that a debtor's ability to pay his debts will, standing alone, justify dismissal under Section 707(b). *In re Kelly*, 841 F.2d 908, 914 (9th Cir.1988). *Kelly* relied on language in the legislative history of a bill introduced into the Senate in 1983, which ultimately lead to the passage of the Bankruptcy Act of 1984.  "The committee report on the final version of S. 445 states clearly that dismissal for substantial abuse is intended to 'uphold[ ] creditors' interests in obtaining repayment where such repayment would not be a burden,' and that 'if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a substantial abuse.' " *Kelly*, 841 F.2d at 914, citing, S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983)(*accord, In re Walton*, 866 F.2d 981 (8th Cir.1989))(debtor's ability to repay two-thirds of his debt over three years was sufficient to justify the bankruptcy court's
finding of "substantial abuse.")

Other circuits, however, have embraced a broader test that allows a bankruptcy court greater discretion to consider all of the circumstances surrounding a debtor's Chapter 7 filing. *See, Green*, 934 F.2d at 572; *In re Lamanna*, 153 F.3d 1, 5 (1st Cir.1998). The ability of the debtor to repay his debts out of future income is a factor in the court's analysis of substantial abuse, but it is not the only factor. The "totality of the circumstances" analysis "demands a comprehensive review of the debtor's current and potential financial situation." *Lamanna*, 153 F.3d at 4. When applying this analysis, the following factors generally are considered:
(1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
(2) whether debtor made consumer purchases far in excess of his ability to repay;
(3) whether debtor's proposed family budget is excessive or unreasonable;
(4) whether debtor's schedules and statements of current income and expenditures reasonably and accurately reflect debtor's true financial condition; and
(5) whether the bankruptcy petition was filed in bad faith.
*Green*, 934 F.2d at 572.

Other circuits have added other factors to the *Green* test. For instance, the Sixth Circuit in *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989) recommended the following matters for

consideration:

> whether [a debtor] has engaged in 'eve of bankruptcy
> purchases,' ... whether ... [he] enjoys a stable source of
> future income, whether he is eligible for adjustment of his
> debts through Chapter 13 of the Bankruptcy Code, whether
> there are state remedies with the potential to ease his
> financial predicament, the degree of relief obtainable through
> private negotiations, and whether his expenses can be
> reduced significantly without depriving him of adequate food,
> clothing, shelter and other necessities.
> *Krohn*, 886 F.2d at 126.

> The approach used by the *Krohn* Court has been referred to
> by other courts and various commentators as a "hybrid"
> between the positions enunciated in *Kelly* and *Green*. The
> distinction between the analysis employed in these cases is
> that *Krohn*, unlike *Green*, holds that a case may be
> dismissed solely because the debtor has the means to repay
> his debts, but does not mandate dismissal on this factor
> alone. *Krohn*, 886 F.2d at 127.

*In re Miller*, 302 B.R. 495, 498-499 (Bankr.MD.Pa.2003).  Because the hybrid approach

permits the widest latitude to take into account all of the evidence in a case, but also

allows a court to recognize that "[a] vast majority of both courts and commentators have

opined that a debtor's ability to pay is the *sine qua non* of section 707(b)," *In re*

*Attanasio*, 218 B.R. 180, 184 (Bankr.N.D.Ala.1998), this Court will adopt it here.   It has

also been expressly employed in another decision from this district.  *See In re Green*,

No. 04-10341, Memorandum Opinion and Order, p.7, October 21, 1995

(Bankr.E.D.Pa.2005) (Carey, J.) (same).


*Ability to Pay*

The Court begins with an analysis of the Debtor's assets and income to

6

determine if there exists an ability to pay.  The Debtor owns no real estate.  *See*

Bankruptcy Schedule A.  His personal property consists of $8000 in a 401(k) fund and

$3000 in clothing.  *See* Schedule B.  Although he claims this property as exempt (*see*

Schedule C), such property may be figured into the ability to pay analysis whether or not

immune from creditors.  *See In re Taylor*, 212 F.3d 395, 397 (8th Cir.2000).  He makes

an annual salary of approximately $200,000.  *See* Schedule K ; T-21.  After payroll

deductions, his net monthly income is roughly $10,900.  *Id.*  He lists no other income.

The Debtor's total monthly expenses total $12,272.  *See* Schedule J.  The

Trustee points out that the Debtor has listed a housing expense of over $3000 per

month yet the house he lives in is owned solely by his wife.  Motion ¶ 4.  And as a

general matter, the Trustee maintains that many of the Debtor's expenses are

excessive or unnecessary.  T-50.  Are the Debtor's expenses legitimate?

*Housing*

Starting with housing, the Court finds well-taken the Trustee's objection to the

Debtor's payment of his nondebtor wife's mortgage.  The burden will therefore be

shifted to the Debtor to explain this unorthodox living arrangement.  To that end, the

Debtor offers the following explanation: in 1994 he purchased the house he presently

lives in for $326,000; it is now worth between $500,000 to $540,000.  T-25.  Sometime

after he married his second wife, he transferred the property to himself and her.  *Id.*

Four years ago, the home was transferred to her for no consideration.  T-24, 25.  The

purpose of the transfer, he explains, was to enable his wife to get financing to pay off

his debt to the IRS.  T-11, 22, 22.  He could not obtain financing himself because of

poor credit.  T-24.  Essentially, then, the Debtor would have the Court accept that he is

7

paying the mortgage debt which his wife incurred for his benefit in exchange for allowing

him to live in that same home.  T-22.

　　　For all its elaboration, the Debtor's testimony fails to shed light on whether the

monthly housing payment is reasonable.  Clearly, the Trustee must concede that the

Debtor must pay for some housing; the question is how much?  In considering whether

a housing expense is excessive, due regard should be given to the size of the family,

their reasonable needs, and the cost of alternative housing.  *In re Beitzel*, 333 B.R. 84,

90 (Bankr.M.D.N.C. 2005).  Furthermore, a court should not unduly depreciate a

debtor's long-standing, traditional ties to a homestead.  *Id.* citing 11 U.S.C. §

524(d)(2)(providing that a court is not required to ascertain whether a reaffirmation of a

consumer debt secured by the debtor's real property would result in an undue hardship

on a debtor or whether it would be in the debtor's best interest).  What are the Debtor's

circumstances?

　　　The Debtor is married; he lists two dependent children, ages 17 and 20.  *See*

Schedule I.  Both children are the product of his former marriage and neither lives with

him full time.  T-40  The older child is in college and the younger lives with his former

wife, but it appears he has alternating weekend visitation rights.  T-40, 44.  By the

Debtor's own testimony, then, this is essentially a household of two people.  *Id*.  How

much housing do the Debtor and his wife need?

　　　Useful in answering that question are the IRS guidelines for assessing an offer-

in-compromise.  An offer-in-compromise is an attempt by a taxpayer to settle a

8

delinquent tax liability. [2]  To assess whether the taxpayer is paying as much as she or he reasonably can under the circumstances, the IRS compares the taxpayer's budget to a compilation of similar expenditures for a similarly situated taxpayer.  Known as the Collection Financial Standards, these guidelines set forth reasonable living expenses some of which vary depending on locality and family size.  See www.irs.gov/individuals/article0,,id=96543,00.html.  Housing is one of those expenses which varies with the region and size of household.  *Id.*  The IRS derives its housing figures from Census and Bureau of Labor Statistics data.  *Id*.  Effective January 1, 2005, a family of two persons residing in Montgomery County, Pennsylvania, should expect to pay $1438 per month for housing and utilities.  *See* www.irs.gov/small/article/0,,id=104836,00.html   These figures have been adopted by the United States Trustee Program for the calculation of the new "means test" to determine substantial abuse under § 707(b)(2) of the BAPCPA.[3]  Although the IRS standard lumps mortgage/rent and utilities together, that figure is broken down into housing and utilities by the United States Trustee Program on its website: $1011 for mortgage/rent and $427 for utilities.  *See* www.usdoj.gov/ust/eo/bapcpa/meanstesting.  This Debtor is already paying $487 per month in utilities.  *See* Schedule J.  That means

---

[2]The Internal Revenue Code provides that the IRS may compromise any tax obligation.  I.R.C. § 7122(a).  The Secretary of the Treasury prescribes guidelines for the IRS to determine whether an offer in compromise is adequate and should be accepted.  I.R.C. §§ 7122(c), 7701(a)(11).

[3]While there is a disclaimer on the IRS website advising the public to refer to the United States Trustee Program for expense information related to bankruptcy calculations, the source of the U.S. Trustee Program's figures is the IRS' figures.  *See* www.usdoj.gov/ust/eo/bapcpa/meanstesting., note 2.  Moreover, the U.S.Trustee Program's website asks the public to report any differences between the figures on the its website and those of the IRS' website.  *Id.*  The figures from the IRS are therefore reliable for present purposes.

that his budgeted mortgage expense ($3146) is three times the amount that the

guidelines deem reasonable.  This expense must be reduced accordingly.

*Other Expenses*

In addition to the housing expense, the Motion takes issue with $487.39 for

electric and heat, $150 for cable, $200 for pet food, $1000 for food, $500 for clothing,

$230 for medical and dental expenses outside of health insurance, $669 for life

insurance, $415 for auto insurance, $62 for pet insurance, $1259 in automobile lease

payments, $1452 for a child's college tuition, $100 for laundry/dry cleaning, and $1130

for his nondebtor wife's credit cards.  *See* Motion ¶4.  At the hearing, the Trustee limited

his challenges to the expenses discussed below.

*Automobiles*

This Debtor leases two cars, a 2005 Acura and a 2003 Yukon, and insures a

third.  T-44, 45.  He explains that the Yukon is needed because he has two dogs and

because he needs to transport his daughter to and from college.  T-46.  That is not a

valid reason for the second car.  Neither should he pay for insurance on that Yukon.

The third car which he insures is a Honda which is driven by his children.  He assumed

that insurance expense pursuant to his divorce decree.  T-44.


*Payment of Expenses*
*For Wife's Benefit*

The Debtor should not be paying for the clothing which his wife wears (T-42), the

cell phone which she uses (T-48), or the charges which she makes on her credit card.

T-49,50.  The Debtor specifically testified that his wife is employed and earns

approximately $40,000 annually.  T-26,27.   She should bear her own expenses.

*Food*

A $1000 monthly expense item for food is excessive given that the Debtor

admitted that dining out is included in that amount (T-41) and that, again, the Debtor's

wife receives an income. *See In re Bryant*, 47 B.R. 21, 25 (W.D.N.C.1984); *In re Krohn*,

886 F.2d at 127.

*Pets*

The Court considers excessive the expenses for pet food and pet insurance.

The Court is in agreement with those cases which hold that "as between the debtor's

[animals] and his creditors, … the creditors should be paid first."  *In re Wyant*, 217 B.R.

585, 587 (Bankr.D.Neb.1998); *see also In re Fauntleroy*, 311 B.R. 730, 738

(Bankr.W.D.N.C.2004) (perceiving a pattern of abuse in excessive pet insurance

expense); *In re Wray*, 136 B.R. 122, 125 (Bankr.W.D.Pa.1992) (finding pet expense

excessive where debtor owed $76,000 to creditors and claimed as exempt virtually of

their assets which could be liquidated to make at least partial distribution to creditors).  It

is reasonable for the creditors to expect the Debtor to pay some amount for pet food;

however, the creditors should not have to bear the expense of pet insurance.


*This Debtor's
Disposable Income*

In order to determine whether this Debtor has an ability to pay his creditors under

a Chapter 13 plan, the Court will reduce his budgeted mortgage expense to $1011, the

figure considered reasonable by the IRS and United States Trustee Program for a

11

similarly situated family in that same locale.  Next, the Court will halve the following

expenses: the auto leases, the clothing, and pet food.  The expense for auto insurance

will be reduced by one-third because he does not need the Yukon.  The entire amount

of his wife's cell phone bills will be eliminated from this calculation.  The Debtor's food

allotment should be reduced by $100 because it include meals in restaurants.  Finally,

the creditors should not be expected to bear any cost of insuring the health of the

Debtor's pets.  That reduces the Debtor's monthly expenses to $8797.57.  Subtracting

that amount from the Debtor's monthly income ($10,907.41) yields disposable income of

$2109.84.  If the Debtor were to pay that amount per month over a 3 year plan, the

amount of a distribution to his unsecured creditors would be as follows:

$2109.84 x 36 months = $75,954.24

less trustee commission (10%)[4] = $7595.42

distribution = $68,358.82

Because his debts total $89,448.30, this Debtor would appear to have enough

disposable income to pay his creditors approximately 76%.  The ability to pay element

is, therefore, satisfied.

*Other Factors Under
the Hybrid Approach*

But because an ability to pay creditors – even in full – does not mandate

dismissal under the hybrid analysis, the Court must review all of the other

circumstances to determine if this filing was abusive.  The Court has already examined

---

[4]For purposes of this hypothetical, the Court will set the Trustee's commission at the highest
percentage allowable.  *See* 28 U.S.C. § 586(e)(1)(B)(i).

CASE 05-16936-sr   Doc 20   Filed 12/19/05   Entered 12/19/05 16:02:27   Desc Main
Document   Page 13 of 26

the Debtor's monthly expenses identifying several which may be either eliminated or reduced without hardship. And where he was not overreaching, this Debtor has failed to give the Court a true and accurate picture of his financial condition. The Debtor testified that the gratuitous transfer of the home to his wife to raise funds to pay the IRS occurred four years ago. T-24. If that is so, then the Court is left to wonder why the refinancing did not occur until just 6 months ago? T-11. That 3½ year hiatus indicates more an attempt to place assets outside the reach of creditors than a vehicle for creative financing. The Debtor also admitted to paying $1130 per month towards his wife's credit card bills yet failed to disclose such payment on his Schedule J. T-49,50. The Court is left to wonder where the money is coming from to pay those bills. And on his Statement of Financial Affairs, the Debtor failed to disclose his income for 2003 and 2004. *See* Statement Financial Affairs, Question #1. On cross-examination, the Debtor identified copies of his joint tax returns for 2002 and 2003; he testified that his 2004 return showed gross income of $236,000. T-27. So for the three years prior to bankruptcy, the Debtor and his wife earned gross income of $207,000 to $236,000 annually. T-27; Ex. T-3, T-4. He alone will earn $200,000 for 2005. T-26. Such stable and significant income makes him better suited for a Chapter 13 filing; he was certainly within its debt limits. *See* 11 U.S.C. § 109(e).[5]

---

[5] The Court is also troubled by the Debtor's decision to list not the present holders of the claims against him but, rather, the original holders. T-59, 60, 63,64. The reason he gives for doing that is that the present holders of the claims lack privity with him. T-63,72,73. The Court finds that position to be highly dubious. Privity is broadly defined as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. *Montella v. Berkheimer Assoc.*, 690 A.2d 802, 804 (Pa.Cmwlth.1997). The Debtor has offered no evidence that the original holders lacked the right to assign their claim, at a discount or otherwise. Without proof of some restraint on assignment, privity by succession would be established between the Debtor and the present holders.

13

*The Purpose of this
Bankruptcy Filing*

But making payment towards his debts is what this Debtor was always intent on

avoiding.  As he explained in his Response, his debts are beyond the statute of

limitations and are, therefore "uncollectible."  Response, ¶ 8.  Notwithstanding, the

Debtor goes on, these debts continue to appear on his credit report.  T-9.  This is

occurring, it was explained to the Debtor by someone he consulted about this problem,

because those debts were "be[ing] resold and resold," they continue to appear as

current debt.  T-23.  Until those claims are expunged from his credit report, says the

Debtor, he cannot obtain new credit.  T-9.  What easier way, then, to correct an

erroneous credit score than to present the credit reporting agencies with the force of a

discharge order? T-59, 67, 68.  That is why the Debtor filed this bankruptcy case.  Is

that a proper purpose?

*Available Remedies Under
the Fair Credit Reporting Act*

The operative premise of this entire bankruptcy filing is that the Debtor's credit

history contains information which should not be on there.  And the corollary argument

is that a bankruptcy filing may be used to correct that.  For purposes of this discussion,

the Court accepts the Debtor's contention that stale information continues to appear on

his credit report.  What, if any, non-bankruptcy law affords him the remedy he seeks.

In 1968, Congress enacted the Fair Credit Reporting Act (FCRA), in order to

establish "reasonable procedures for meeting the [credit reporting] needs of commerce"

and the banking industry in a "manner that is fair and equitable to the consumer, with

regard to the confidentiality, accuracy, relevancy and proper utilization of such

14

information ...." 15 U.S.C. §§ 1681(b), et seq.  The FCRA was essentially prompted by "congressional concern over abuses in the credit reporting industry." *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3rd Cir.1996)(*quoting Guimond v. Trans Union Credit Info Co.*, 45 F.3d 1329, 1333 (9th Cir.1995)).  As such, one of the main goals of the FCRA is to protect individuals from inaccurate or arbitrary information found in their credit history reports.  *See Pinner v. Schmidt*, 805 F.2d 1258, 1261 (5th Cir.1986).  In other words, a general purpose of the FCRA is to protect the creditworthiness and reputation of every consumer.  *Ackerley v. Credit Bureau of Sheridan, Inc.*, 385 F.Supp. 658, 659 (D.Wyo.1974).  To that end, the FCRA requires that a credit report must exclude the following information:

> (a) Information excluded from consumer reports[6]
>
> Except as authorized under subsection (b) of this section, no consumer reporting agency may make any consumer report containing any of the following items of information:
>
> (1) Cases under Title 11 or under the Bankruptcy Act that, from the date of entry of the order for relief or the date of adjudication, as the case may be, antedate the report by more than 10 years.
>
> (2) Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period.
>
> (3) Paid tax liens which, from date of payment, antedate the report by more than seven years.
>
> (4) Accounts placed for collection or charged to profit and

---

[6]The Act defines the term "consumer report" to mean "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness...."  15 U.S.C. § 1681a(d)(1).

loss which antedate the report by more than seven years.

(5) Any other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.

15 U.S.C. § 1681c(a).  The Federal Trade Commission[7] dubs this type of objectionable information to be "obsolete."  16 C.F.R. Pt.600, App. § 605.  The FCRA prohibits the reporting of most adverse information which is more than seven years old 15 U.S.C. § 1681c(a); 16 C.F.R. Pt.600, App. § 605(1).   The FCRA provides specific time frames for five specialized types of information -- bankruptcies, suits and judgments, paid tax liens, accounts placed for collection or charged to profit or loss, and records relating to a crime -- and then provides a general rule for "any other adverse item of information," excepting "records of convictions of crimes." Consumer Credit Law Manual § 16.06[2] (Matthew Bender).  The information complained of here – stale credit card debt – would not come within the definition of the first three examples.  And on this record, it would likewise not come within the fourth as there is no evidence that the accounts were either placed for collection or charged off.  That leaves the fifth example – adverse information – which is akin to a catch-all provision.  The term "adverse information" has been defined as

---

[7]The Federal Trade Commission ("FTC") is the federal agency empowered by Congress to administer and enforce this statute. 15 U.S.C. § 1681s. The Fair Credit Reporting Act provides the FTC with "procedural, investigative and enforcement powers, including the power to issue procedural rules to enforce compliance" with the act.  *Id.*  As the act's administrative agency, the FTC has issued various commentaries and interpretive readings of the act, the most recent of which is its Statement of General Policy or Interpretation: Appendix – Commentary on the Fair Credit Reporting Act.  16 C.F.R. § Pt. 600, App. ("the Official Staff Commentary")  While the FTC was not given rule-making authority as to the FCRA, this Court may nonetheless defer to the FTC's interpretations of the act on issues not expressly addresses by Congress. *See  Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

> information which may have, or may reasonably be expected
> to have, an unfavorable bearing on a consumer's eligibility or
> qualifications for credit, insurance, employment, or other
> benefit, including information which may result, or which may
> be reasonably expected to result, in a denial of or increased
> costs for such benefits.

*Equifax, Inc. v. Federal Trade Commission*, 678 F.2d 1047, 1050 (11th Cir.1982) citing

FTC's Final Order to Cease and Desist issued December 15, 1980.  The general rule

that adverse items (other than criminal conviction records and the five exceptions listed

in the statute) cannot antedate the report by more than seven years applies to most

information about delinquent loans other than those placed for collection or charged to

profit and loss.   16 C.F.R. Pt.600, App. § 605(a)(6) item 1.  The existence of a

delinquent account may be reported for seven years from the date of the last regularly

scheduled payment before the account became delinquent.  *Id.*  Accepting Debtor's

contention that his debts are at least ten years old (T-13), they would constitute adverse

information which should have been excluded from his credit report.  What, then, does

the FCRA allow the Debtor to do about the reporting agency's reporting of such

obsolete information?

A consumer has a private right of action against persons[8] who fail to comply with

*any* FCRA requirement.  *See* 15 U.S.C. § 1681n and *o*.  That person would be liable for

actual damages sustained as a result of negligent noncompliance with the act and, in

the case of a successful action, the costs of the action together with reasonable

attorney's fees. 15 U.S.C. § 1681*o*(a).  A person who willfully fails to comply with the

---

[8]A "consumer reporting agency" is defined as a person for purposes of the FCRA.  15 U.S.C.
§ 1681a(f).

FCRA is liable for either (a) actual damages sustained by the consumer as a result of

the violation or (b) damages ranging from $100 to $1000.  15 U.S.C. § 1681n(a)(i)(A).

In addition, willful noncompliance may also result in punitive damages.  15 U.S.C. §

1681n(a)(2).  So as to the credit reporting agencies, the Debtor had a clear avenue to

relief outside of bankruptcy.

*Relief Under the FCRA*
*as to the Creditors*

It is not only consumer reporting agencies whose actions are governed by the

FCRA.  The act also references users of consumer reports as well as furnishers of

information to the consumer reporting agency.  *See* 15 U.S.C. § 1681s-2; *see also,*

*generally, Carney v. Experian Information Solutions, Inc.*, 57 F.Supp. 496, 500-502

(W.D.Tenn.1999).  The act was amended in 1996 to "provide new tools to insure that

furnishers of information to consumer reporting agencies cooperate in maximizing the

goal of the [FCRA] that only accurate and complete information is included in credit

reports." *Vasquez-Garcia v. Trans Union de Puerto Rico*, 222 F.Supp.2d 150, 154

(D.P.R.2002) quoting Richard J. Rubin, *"Fair Credit Reporting Act Amendments Provide*

*New Duties on Furnishers of Information*," Corporate Law and Practice Course

Handbook Series, Practicing Law Institute, Vol. 4, Issue 1, p. 203, 205 (April 1999).  A

"furnisher of information" is not specifically defined in the FCRA, but case law has

"defined it as an entity 'which transmits information concerning a particular debt owed

by a particular consumer to consumer reporting agencies such as Experian, Equifax,

MCCA, and Trans Union.' " *DiMezza v. First USA Bank Inc.*, 103 F.Supp.2d 1296, 1299

(D.N.M.2000)(quoting *Carney*, 57 F.Supp.2d at 501).  The credit card claimants in this

case would come within that definition.  What duties does the FCRA impose upon such

persons?

Section 1681s-2 of the act provides, in pertinent part:

(b) Duties of furnishers of information upon notice of dispute

(1) In general

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall–

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly–

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

(2) Deadline

19

> A person shall complete all investigations, reviews, and
> reports required under paragraph (1) regarding information
> provided by the person to a consumer reporting agency,
> before the expiration of the period under section 1681i(a)(1)
> of this title within which the consumer reporting agency is
> required to complete actions required by that section
> regarding that information.

15 U.S.C. § 1681s-2(b).  One court has encapsulated the furnisher's duties under this

subsection:

> This [sub]section specifies what happens after a [credit
> reporting agency] receives notice "pursuant to section
> 1681i(a)(2) ... of a dispute with regard to the completeness
> or accuracy of information provided by a person" to the CRA.
> The person, i.e., the furnisher of the disputed information,
> has four duties: to conduct an "investigation with respect to
> the disputed information;" to review all relevant information
> provided by the CRA; to report the results of its investigation
> to the CRA; and if the investigation finds the information is
> incomplete or inaccurate to report those results "to all
> [nationwide] consumer reporting agencies to which the
> person furnished the information."

*Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059 (9th Cir.2002); *see also*

*Vasquez-Garcia*, 222 F.Supp.2d at 154 (explaining that § 16821s-2(b) imposes a duty

upon a furnisher of information to conduct investigation and promptly report any

inaccurate or incomplete information to consumer reporting agencies, upon notice of a

dispute by a consumer).  Had the Debtor disputed these items with the credit reporting

agency, the agency would then have been required to notify the furnisher of the

information – here, the credit card companies – of the dispute.  That, in turn, would have

triggered the above-cited duties on the credit card companies' part.  And if the

furnishers of information would fail to comply with those duties, they would be subject to

liability under §1681n and *o*.  There are specific limitations on furnisher liability found in

15 U.S.C. § 1681s-2(c)[9]; however, these limitations do not apply to violations of §

1681s-2(b):

>The civil liability sections, 15 U.S.C. § 1681n and 1681*o*,
>explicitly provide a private right of action for consumers
>wishing to enforce any provision of the Fair Credit Reporting
>Act against "any person" who either "willfully fails to comply"
>or is "negligent in failing to comply." Absent any explicit
>limitation, the plain language of 15 U.S.C. §§ 1681n, 1681o,
>1681s-2(b) and (c) provide a private right of action for a
>consumer against furnishers of information who have willfully
>or negligently failed to perform their duties upon notice of a
>dispute. Furthermore, the negative inference of explicitly
>precluding a consumer's right of action for violations of §
>1681s-2(a) is that they are preserved in § 1681s-2(b).
>Accordingly, the plain language of the Fair Credit Reporting
>Act compels the conclusion that there is a private right of
>action for consumers to enforce the investigation and reporting duties imposed on furnish

*Sheffer v. Experian Information Solutions, Inc.*, 249 F.Supp.2d 560, 562 (E.D.Pa. 2003)

*citing DiMezza v. First USA Bank, Inc.*, 103 F.Supp.2d at 1300; *see also Nelson v.*

*Chase Manhattan Mortg. Corp.*, 282 F.3d at 1060 (describing purpose of § 1681s-2(b)

as "provid[ing] some private remedy to injured consumers") The Debtor was thus

afforded an avenue of relief as against the credit card companies who were furnishing

---

[9](c) Limitation on liability

Except as provided in section 1681s(c)(1)(B) of this title, sections 1681n and
1681o of this title do not apply to any violation of--

(1) subsection (a) of this section, including any regulations issued
thereunder;

(2) subsection (e) of this section, except that nothing in this paragraph shall
limit, expand, or otherwise affect liability under section 1681 or 16810 of
this title, as applicable, for violations of subsection (b) of this section; or

(3) subsection (e) of section 1681m of this title.

15 U.S.C. § 1681s-2(c)

obsolete information as well as the credit reporting agencies.

As the Court pointed out to the Debtor, the record does not show that he availed himself of any of the FCRA's remedies. The provisions of this act are specifically designed for the harm which the Debtor claims he is suffering yet all he appears to have done is consulted some unnamed person about why these charges continue to appear on his credit report; there is no indication that the Debtor ever contacted the credit reporting agencies.[10]  *See Casella v. Equifax Credit Information Services, Inc.*, 56 F.3d 469, 474 (2d Cir.1995) ("Prior to being notified by a consumer, a credit reporting agency generally has no duty to reinvestigate credit information." Had he exhausted the administrative procedures under the FCRA and still received no relief he could have then proceeded in federal court.  *See O'Brien v. Equifax Information Svs.,* 382 F.Supp.2d 733, 734 (E.D.Pa. 2005) (explaining that the FCRA creates subject matter jurisdiction in federal court as it involves a federal question pursuant to 28 U.S.C. § 1331).  So his contention that he would have to proceed in state court (T-52) is incorrect; the FCRA provided him with an independent basis of federal court jurisdiction. And once in federal court, the Debtor would not – as he insisted he would – have to file over twenty separate lawsuits against twenty different creditors (T-52), but, rather could join as defendants both the credit reporting agencies and those creditors who continue to furnish the inaccurate information.  *See* F.R.C.P. 20; *see also* 4 *Moore's Federal*

---

[10]His counsel explained that the Debtor met with a credit counselor but the testimony is not clear on exactly whom he consulted. T-57.  Regardless, a statement by this unknown individual is hearsay and will be given no weight.  *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1234 n. 9 (3d Cir.), *cert. denied*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

*Practice, Civil* § 20.02(a)(i) ("The permissive party joinder rule gives the plaintiff a powerful tool to structure litigation in the complaint.")   The Debtor's claims against both the credit reporting agencies and the claim holders arise out of the same series of transactions or occurrences – here the furnishing and reporting of obsolete information – which constitutes a violation of the FCRA. *Id*.  There was, then, no need to proceed in Bankruptcy Court to obtain the relief that the Debtor desires.

*Summary*

This case is a misuse of the bankruptcy system for a number of reasons.  The principal purpose of the Debtor in filing this case is not to obtain relief from oppressive indebtedness.  Indeed, it is the Debtor's position that outside of bankruptcy he cannot be made to pay any of the debt which he seeks to discharge, because recovery would be barred by the statute of limitations.  The Debtor's sole purpose in commencing this case is to improve the content of the reports which credit reporting agencies issue about him.  However, as discussed above, the Debtor's credit report problems can be corrected outside of bankruptcy.  In fact, while a bankruptcy discharge might relieve him of his uncollectible scheduled debts, it would adversely affect his credit because the bankruptcy itself would be reportable.  It seems counterintuitive, therefore, to conclude that a bankruptcy filing helps him.  Completely aside from that, however, his financial condition demonstrates that he clearly is able to pay his creditors a substantial amount of what they are owed, irrespective of whether it remains within their ability to pursue recovery.  It is apparent that the Debtor has sought relief under Chapter 7 simply because he views it as a more expedient means to obtain relief than to seek such relief under other statutes specifically enacted to address his circumstances.  The Court

23

views this as an artifice which it should not condone.   In closing, the Court reiterates

that the Debtor's failure to candidly portray his financial situation is an additional factor

which militates against him in this setting and further supports the dismissal of his case.

BY THE COURT:

_____
STEPHEN RASLAVICH
UNITED STATES BANKRUPTCY JUDGE

DATED:  DECEMBER 19, 2005

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE                                          : CHAPTER 7
                                               :
ROBERT S. MILLER                               : BANKRUPTCY NO. 05-16936
                                               :
              DEBTOR                           :
_____

# ORDER

AND NOW, upon consideration of the United States Trustee's Motion to Dismiss

Pursuant to 11 U.S.C. § 707(b), the Debtor' Response, after hearing held on November

15, 2005, and for the reasons stated in the foregoing Opinion, it is

ORDERED, that the Motion is Granted and that the above-captioned case is

Dismissed.


                              BY THE COURT:


                              _____
                              STEPHEN RASLAVICH
                              UNITED STATES BANKRUPTCY JUDGE

DATED:  DECEMBER 19, 2005

**MAILING LIST:**

George Conway, Esquire
Office Of The U.S. Trustee
950W Curtis Center
7th & Sansom Streets
Philadelphia PA  19106

Frank J. Marcone, Esquire
2530 North Providence Road
Upper Providence, PA 19063